UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JANICE KOLERSKI,
and BENJAMIN C. HEATH,
*Individually and as Co-Executors of the*
*Estate of Edward A. Heath, deceased,*

                Plaintiffs,

    v.

                                **DECISION AND ORDER**
UNITED STATES OF AMERICA,             06-CV-422S

                Defendant.

## I. Findings of Fact

**A.    Background**

1.    On October 3, 2006, Plaintiffs Janice Kolerski and Benjamin C. Heath, as co-executors of the estate of Edward Heath, filed an Amended Complaint (Docket No. 6) against the United States of America under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §1346(b) and 28 U.S.C. §2671, et seq.

2.    Plaintiffs alleged that negligent medical care provided by the Department of Veteran's Affairs Medical Center had proximately caused Heath to "suffer[] severe, permanent and painful injuries, including conscious pain and suffering, ultimately resulting in his death."  (Amended Complaint, Docket No. 6, ¶ 13).

3.    The United States conceded liability and causation.  (Tr. at 3-4).

4.    On June 9, 10, and 11, 2008, this Court conducted a Bench Trial on the issue of damages.  Plaintiffs called the following witnesses: Benjamin Heath, Janice Kolerski, Dr. Michael Kane, Karl Vogel, Margaret Vogel, Dean Moretti, and Dr. Andrew Esch.  The Parties stipulated to the admission of Plaintiff's medical records.  Defendant did not call any witnesses.

**B.     Edward Heath**

5.      At the time of the events in this case, Edward Heath was 86 years old.  (Ex. 2 at 183).  He was a veteran, having served in the military in World War II.  (Tr. at 43-44).

6.      Since the death of his wife in 2000, Heath lived by himself in Lackawanna, NY.  (Tr. at 43-44).  Heath owned and managed a four-unit apartment, which he maintained with the help of his children.  (Tr. at 43-44).

7.      Heath had some health problems, including hypertension, atrial fibrillation, general aches and pains, and a history of bladder cancer, which was stable at the time of the events in this case.  (Tr. at 302).

8.      Heath enjoyed playing golf.  (Tr. at 52).  He drove a car, and was assessed as "safe to drive" by his physician's office in June of 2004.  (Tr. at 303).  Heath's family testified that he had no problems speaking or communicating.  (Tr. at 49, 52).

**C.     Events leading up to Heath's Hospitalization**

9.      Dr. Michael Kane was Heath's primary care physician.  (Tr. at 260).

10.      Dr. Kane prescribed Heath with Coumadin, a blood thinner, to treat atrial fibrulation.  (Tr. at 265).

11.      Heath went to the Veteran's Affairs Medical Center ("VA") Coumadin Clinic for monitoring and management of his Coumadin dosage.  (Tr. at 267).

12.      On June 17, 2004, Heath went to the VA Coumadin Clinic for a blood draw to measure his Coumadin levels.  (Ex. 1 at 37-38).  At the Clinic, Heath complained of a bruise on his right ankle.  (Ex. 1 at 37-38).  When Heath returned home, his daughter Margaret Vogel observed the bruise, applied ice, and had Heath elevate his ankle.  (Tr. at 396-97).

13.     On June 18, 2004, Heath experienced pain, bruising, and swelling in his right leg.  (Tr. at 262-63, 272).  He called for an ambulance around 7:00 PM, and was taken to the Mercy Hospital Emergency Room.  (Tr. at 251).

**D.     Hospitalization**

14.     At Mercy Hospital on June 18, 2004, it was determined that Heath's Coumadin level was dangerously high.  (Tr. at 263).  Heath was admitted to Mercy Hospital for "reversal of his anticoagulation, and pain management and observation of his leg."  (Tr. at 263).

15.     At the time of his admission, Heath's pain was graded as "a sharp pain and it was three to six out of ten in intensity.  Localized to the right leg."  (Tr. at 272).

16.     Dr. Kane attributed Heath's pain at the time he was admitted to a hematoma which caused swelling in Heath's leg.  (Tr. at 273-74).  As Dr. Kane explained:

> The body generally doesn't like to be stretched, and any part of your body that gets stretched either by fluid or swelling, it hurts. . . . Because of this hematoma at the time of his admission [] it was thought the blood underneath the skin was stretching the skin and pushing on the structures below, which would be muscles, nerve, [and] eventually bone . . . ."  (Tr. at 274-75).

17.     The day he was admitted, Heath was given a dose of Dilaudid (a morphine relative, prescribed for severe pain).  (Tr. at 295).

18.     On June 20, 2004, Heath's daughter, Margaret Vogel, visited Heath and observed the following:

> "He was gritting his teeth. He was -- any time he couldn't get comfortable -- like everything was hurting. . . . But he was just miserable. He just didn't want to cooperate as far as like you said, reading his card, he was too -- in too much pain to even do that."  (Tr. at 407).

3

19.     On June 21, 2004, Heath had a fever and reported to Dr. Kane that he "felt like garbage." (Tr. at 277).  Dr. Kane explained that Heath had an open wound on his right leg, which Kane described as a "big blood blister . . . extend[ing] initially pretty much the whole right shin area of the front part of the leg.  (Tr. at 277).

20 .    On June 22, 2004, Heath's fever continued, and he complained of increased leg pain.  (Tr. at 142).

21.     On June 23, 2004, Heath "complained of mild leg pain and feeling lousy and thirsty." (Tr. 142).

**E.     Pain Management**

22.     While at Mercy Hospital, Heath was regularly administered Dilaudid when he complained of pain.  (Tr. at 318-20, Ex. 2 at 476).

23.     Dr. Kane testified that the Dialudid was "partially" effective at controlling Heath's pain.  (Tr. at 319).  Dr. Kane testified that between June 19, 2004, and June 23, 2004, Heath received adequate pain management.  (Tr. at 320).

24.     Dr. Andrew Esch is a physician employed by Hospice who specializes in palliative care—a speciality focused on quality of life and symptom management of patients with serious chronic illness or terminal illness.  (Tr. at 129-33).

25.     Dr. Esch testified that in his opinion, Heath's pain was "undertreated." As Dr. Esch explained: "Attempts were made to treat his pain. Doses were regularly escalated, but they seemed to trail behind, which is not uncommon." (Tr. at 170-73).

**F.     Compartment Syndrome**

26.     On June 24, 2004, Heath complained that his right leg was "quite painful." (Ex. 2 at 170).  A consult with the infectious disease specialist suggested "compartment

syndrome."  (Tr. at 144-46, Ex. 2 at 171).

27.     Dr. Esch explained that "compartment syndrome" is

> an injury in which an area of the body that's limited in terms of
> its ability to expand, it's bordered by connective tissue and
> bone, and any insult to that area that causes increase in
> pressure, whether it be swelling, bleeding, crush injury --
> sometimes in motor vehicle accidents you see that -- causes
> an increase in the pressure within that space, compromising
> the nerves and the blood vessels leading to, in its worse form,
> death of the tissues in the affected compartment. . . . The
> hallmark of diagnosis of compartment syndrome is pain out of
> proportion to what the injury appears to be clinically. . . . the
> area may just look bruised or swollen, but the pain will be such
> that it would be difficult to control with opiate,  and the injury
> won't look as bad as what the patient is reporting to you in
> terms of the pain that they're feeling.  (Tr. at 144-45).

28.     Dr. Kane testified that a kidney specialist was also consulted regarding

"muscle breakdown in the compartment syndrome" which Dr. Kane explained put a great

strain on Heath's kidneys, and while not acutely painful, would make him not feel  well.  (Tr.

at 285-86).  Dr. Kane stated that kidney failure contributed to Heath's "feeling of garbage

or rotten feeling."  (Tr. at 287).

**G.     Amputation**

29.     On June 25, 2004, Dr. Steining, a surgeon, informed Heath and his family

that "given the magnitude of the problem, age, comorbidity, and minimal chance of limb

salvageability, [Heath would] be best served by AKA [above the knee amputation.]"  (Tr.

at 333-34, Ex. 2 at 211).

30.     Because Heath was suffering from confusion, he lacked the ability to consent

to the amputation, and consent had to be obtained from Heath's son Benjamin.  (Ex. 2 at

289).

31.     On June 25, 2004, Heath underwent an above the knee amputation of his

right leg.  (Tr. at 186-87).

32.    Following the amputation, Heath was sedated and on a ventilator, and continued to receive Dilaudid.  (Ex. 2 at 213, 426-27).

33.    Heath's son Benjamin testified that after the amputation he observed Heath repeatedly reach down to where his leg had been amputated.  (Tr. at 93-94).

34.    Dr. Kane testified that Heath still suffered from some leg pain after the surgery.  (Tr. at 293-94).

35.    On June 26, 2004, Heath was taken off the ventilator.  Notes indicate that he was stable, but "complaining of pain in his right leg lower extremity."  (Tr. at 340-41).

## H.    Respiratory Distress

36.    On June 29, 2004, While in the ICU, Heath experienced respiratory distress. (Ex. 2 at 226).  He was reintubated and put back on a ventilator.  (Ex. 2 at 226).  Dr. Kane testified that respiratory distress is a source of emotional pain and suffering, and "usually it creates a lot of distress, as it did with Mr. Heath."  (Tr. at 297-98).

37.    Beginning on June 29, 2004, Dr. Kane ordered that Heath be given restraints due to his combativeness and agitation, which Dr. Kane testified were signs that Heath was in pain.  (Tr. at 481-82).

38.    Dr. Kane testified that he believed Heath was in pain on days when he ordered that Heath be restrained.  (Tr. at 482-83).

39.    Dr. Kane explained that during this time, although Heath's pain was controlled, it was not eliminated:

> Controlled is not the same as eliminated. To eliminate something would mean that it's gone forever, at least, or for a long period of time. Controlled just means that the person is comfortable enough to live with it and so -- but in this situation

6

pain was not eliminated. It was controlled, and that's what
everyone's goal is to do, is to try to control someone's pain.
(Tr. at 484).

40.     On July 2, 2004, Heath remained on the ventilator, and was noted as sedated, calm, and not responsive to verbal stimuli.  (Tr. at 460).

41.     On July 3, 2004, Heath required additional sedation to treat an elevated respiratory rate, and was given two doses of Dilaudid.  Heath was noted as sedated, calm, and not responsive.  (Tr. at 460-61).

42.     On July 4, 2004, Heath was treated with a sedative and Dilaudid, and was noted as "not responding to painful stimuli."  (Tr. at 463).

43.     On July 5, 2004, Heath was again noted as "sedated and not responsive."  (Tr. at 463).

44.     Dr. Kane testified that on certain days when Heath had an increased respiratory rate he was likely experiencing pain.  (Tr. at 483).

**I.     Heath's Death**

45.     In the days leading up to Heath's death, attempts to wean him from sedation and ventilation were unsuccessful.  (Tr. at 470-71).

46.     On July 9, 2004, Heath's family agreed to limit his treatment and removed him from the ventilator.  (Ex. 2 at 279).

47.     When Heath was taken off sedation and the ventilator, he was given a morphine drip.  (Tr. at 477).

48.     Heath died on July 9, 2004, at 4:00 PM.  (Ex. 13).

## II. CONCLUSIONS OF LAW

**A.    Legal Standard**

49.    The liability of the United States is determined under the laws of the state where the subject act or omission occurred.  28 U.S.C. § 1346(b)(1).  Accordingly, this case is governed by New York law.

50.    The United States has conceded liability and proximate causation.  (Tr. at 3-4).  The only matter for the Court to determine is the amount of money damages to be awarded to Plaintiffs for Heath's pain and suffering.

51.    Plaintiff bears the burden in this case to establish damages by a fair preponderance of the evidence.  Craig Test Boring Co., Inc. v. Saudi Arabian Airlines Corp., 138 F.Supp.2d 553, 557 (S.D.N.Y. 2001).

**B.    Pain and Suffering**

52.    "When determining the appropriate damages for pain and suffering, [the Court] is bound by a standard of reasonableness." Mastrantuono v. United States, 163 F.Supp.2d 244, 258 (S.D.N.Y.2001).

53.    "There is no precise rule for fixing the value of pain and suffering. Instead, the trier of the facts must determine the value from all of the evidence in the particular case." DiPirro v. United States, 43 F.Supp.2d 327, 345 (W.D.N.Y. 1999) (*judgment amended at* 189 F.R.D. 60).

54.    As stated in the New York Pattern Jury Instructions, if a defendant is found liable, the "plaintiff is entitled to recover a sum of money which will justly and fairly compensate [him or her] for any injury and conscious pain and suffering to date caused by

defendant.  Conscious pain and suffering means pain and suffering of which there was some level of awareness by plaintiff."  <u>See</u> NY PJI 2:280 (2007).

55.    "In New York, the term 'pain and suffering' encompasses all items of general, non-pecuniary damages and includes the physical and emotional consequences of an injury.  It also includes the loss of the enjoyment of life which compensates for 'the frustration and anguish caused by the inability to participate in activities that once brought pleasure.'"  <u>Furey v. United States</u>, 458 F.Supp.2d 48, 56 (N.D.N.Y. 2006) (citing <u>McDougald v. Garber</u>, 73 N.Y.2d 246, 251, 538 N.Y.S.2d 937, 536 N.E.2d 372 (1989)).

56.    "To recover damages for pain and suffering, an injured plaintiff must have some level of awareness.  Moreover, '[i]n determining damages for conscious pain and suffering experienced in the interval between injury and death, when the interval is relatively short, the degree of consciousness, severity of pain, apprehension of impending death, along with duration, are all elements to be considered.'"  <u>Ramos v. Shah</u>, 293 A.D.2d 459, 740 N.Y.S.2d 376 (N.Y.App.Div., 2002) (quoting <u>Regan v. Long Island R.R. Co.</u>, 128 A.D.2d 511, 512 N.Y.S.2d 443 (N.Y.App.Div., 1987)).

**C.    Comparable Cases**

57.    When determining a pain and suffering award, it is appropriate for the Court to review awards in comparable cases.  <u>Furey</u>, 458 F.Supp.2d at 56.

58.    In <u>Arias v. New York</u>, (8 Misc.3d 736, 795 N.Y.S.2d 855 (N.Y.Ct.Cl., 2005) (*aff'd* 33 A.D.3d 951, 822 N.Y.S.2d 727 (N.Y.App.Div., 2006))), the estate of William E. Newborn, a prisoner, sued the State after Newborn received an overdose of medication, was hospitalized for 13 days, and ultimately died.  Newborn suffered a seizure while being

9

taken to the hospital and was "bagged" (a mask was placed over his nose and mouth).

At the hospital, he was medicated and intubated. He was given a nasal feeding tube, a

foley catheter into his bladder, an arterial line into his wrist, and a Swanz-Ganz catherter

which ran to his heart. Newborn was given a tracheotomy ten days after being admitted

to the hospital due to respiratory failure. The Court of Claims noted testimony that:

> there were multiple times on almost every one of the 13 days
> during decedent's hospitalization that he was sedated and/or
> unresponsive and also periods where he was awake and
> attempted to communicate or was thrashing about, writhing
> and bucking the vent, which [his doctor] testified was because
> decedent was experiencing pain. Id. at 739.

The Court of Claims discounted testimony that Newborn was aware he was dying.

Lastly, despite some doubt as to Newborn's level of consciousness at various stages of his

treatment, the Court noted:

> there is no doubt whatsoever in the court's mind that some
> degree of conscious pain and suffering did exist. At the very
> least, the court notes that numerous invasive procedures (i.e.,
> intubation, catheterizations and tracheotomy) were performed
> upon decedent and each of these were a source of
> discomfort/pain regardless of local anesthesia administered.
> Id. at 740.

The Court of Claims awarded Newborn's estate $350,000 for conscious pain and

suffering experienced during the 13-day period prior to Newborn's death. Id.

On appeal, the Appellate Division affirmed the award. While this appeal was

brought by the claimant—who challenged the award as inadequate—the Appellate Division

held that "the amount awarded by the Court of Claims for conscious pain and suffering did

not deviate materially from what would be considered reasonable compensation for this

element of damages." Arias v. New York, 33 A.D.3d 951, 951, 822 N.Y.S.2d 727, 728

(N.Y.App.Div., 2006).

59.     This Court finds that the pain and suffering discussed in the <u>Arias</u> decision is substantially similar to the pain and suffering experienced by Heath in the instant case. Both Heath and Newborn were hospitalized for approximately two weeks following an overdose in medication.  (Tr. at 263; <u>Arias</u>, 8 Misc.3d at 737-39).  Both men underwent several invasive procedures to treat their worsening conditions while at the hospital.  (Tr. at 186-87 (Heath's leg was amputated), Ex. 2 at 226 (Heath was intubated and put on a ventilator); <u>Arias</u>, 8 Misc.3d at 737-39 (Newborn was "bagged," catheterized numerous times, intubated, and given a tracheotomy)).   Both men were regularly treated with medication for pain management and sedation.  (Tr. at 318-20; <u>Arias</u>, 8 Misc.3d at 738). Both men were restrained after becoming agitated and combative, which doctors in both cases testified was evidence of conscious pain and suffering.  (Tr. at 481-83 (Heath restrained for "combativeness" and "agitation;") <u>Arias</u>, 8 Misc.3d at 739 (Newborn "was thrashing about, writhing and bucking;" <u>see also</u>, Claimant's Brief to the New York State Appellate Division in <u>Arias</u>, 2005 WL 5061336, at *7-9 (noting that Newborn was restrained for 13 days, and was "combative" and "agitated")).  Lastly, both men were sedated and at times unresponsive while they were hospitalized.  (Tr. at 460-63; <u>Arias</u>, 8 Misc.3d at 739). Given these substantial similarities, this Court finds the <u>Arias</u> decision particularly instructive in determining an award for conscious pain and suffering in the present case.

60.     Also instructive is the New York State Appellate Division's Decision in <u>Ramos v. Shah</u> (293 A.D.2d 459, 740 N.Y.S.2d 376 (N.Y.App.Div., 2002)).  In <u>Ramos</u>, the plaintiff was hospitalized for dehydration and shock.  <u>Id.</u> at 460.  While at the hospital, he suffered cardiac arrest, lapsed into a coma, and died several days later.  <u>Id.</u>  The <u>Ramos</u> Court held

that the $900,000 award for pain and suffering was excessive, and ordered a new trial

unless the parties agreed to reduce the award to $450,000.  Id.  In reaching its decision,

the Ramos Court noted that "although the decedent had lapsed into a coma, there was

evidence that he had some level of consciousness for several days."  Id. at 460.

61.    As a ceiling on the pain and suffering award, this Court has also considered

the New York State Appellate Division's Decision in Huthmacher v. Dunlop Tire Corp., 309

A.D.2d 1175, 765 N.Y.S.2d 111 (N.Y.App.Div., 2003).  In Huthmacher, the Court vacated

a $1 million award for conscious pain and suffering as unreasonable where decedent was

hospitalized for 69 days, but was comatose for all but 10 of those days.  Id. at 1176.  The

Huthmacher Court remanded the case for a new trial on damages.

**D.    Conclusion**

62.    Having reviewed the cases submitted by the parties—particularly the Arias

case, and having considered the testimony, including the expert testimony, the exhibits,

and the parties' submissions, the Court finds that Plaintiffs have established by a

preponderance of the evidence that they are entitled to $400,000 as reasonable

compensation for Heath's conscious pain and suffering.  The Court makes this finding in

light of the invasive procedures performed on Heath—-in particular the amputation, the

duration of Heath's hospitalization, the fact that although Heath's pain was generally

managed it was not eliminated, and the extensive evidence of both physical and emotional

pain and suffering.

63.    Additionally, as agreed to by the Parties, this Court awards Plaintiffs

$4,343.64 for funeral expenses, and $17,394.15 for medical expenses.  (Defendant's

Proposed Findings of Fact and Conclusions of Law, Docket No. 61, pp. 27-28).

**E.      Orders**

IT HEREBY IS ORDERED, that Plaintiffs are awarded $400,000 for Heath's conscious pain and suffering, $4,343.64 for funeral expenses, and $17,394.15 for medical expenses.

FURTHER, that the Clerk of the Court is directed to enter Judgment consistent with this Decision and Order.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.


Dated: September 2, 2008
         Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge